NATIONAL DUMP CAR CO. v. RALSTON STEEL CAR CO.

(Circuit Court of Appeals, Sixth Circuit. August 2, 1909.)

No. 1,926.

1. PATENTS (§ 64*)—SCOPE—"PIONEER PATENTS."

A pioneer patent is one which first discloses means to accomplish a certain result, and the term does not apply to a patent for new means to accomplish a result already attained in another way, although they may be an improvement on the old way.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 79; Dec. Dig. § 64.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—DUMP CARS.

The Caswell reissue patent, No. 12,447 (original No. 806,394), for an improvement in cars, consisting of trapdoors in the bottom of the car which may be opened to dump its load, claims 31, 32, 44, 48, 58, 59, 60, 61, 62, and 63, which relate only to the doors, and means for operating them, disclose invention, but not of a primary character, and are not infringed by a device which does not contain the longitudinal shaft operated by means of cogged pinions and plates to open and close the doors, which is an essential feature of each claim, nor any equivalent therefor having substantially the same mode of operation.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

Thomas F. Sheridan and Robert H. Parkinson, for appellant.

H. A. Seymour, for appellee.

Before LURTON, SEVERENS, and WARRINGTON, Circuit Judges.

SEVERENS, Circuit Judge. The questions arising upon this record concern the validity, the scope, if the patent is valid, and the infringement of letters patent originally granted to William A. Caswell, assignor to the National Coal Dump Car Company, dated December 5, 1905, and reissued February 6, 1906. The number of the reissued patent is 12,447, and it professes to be for "a new and useful improvement in cars." "The invention relates," says the patentee, "to a class of freight cars having a level floor, provided with trapdoors adapted to be opened to dump their loads, when the latter consist of sand, gravel, coal or grain." And the patentee further states that the main feature of it "is the dispensing with the side sills heretofore used in all cars" of which he had any knowledge. He goes on to explain how the presence of such side sills obstructs the dumping out to the side of the track the contents of the car, and states in a general way that he arranges his trapdoors in a series along each side of the floor of the car hinged at their inner edges and provided with means for support-

ing and operating such doors, so that when opened they deflect the coal, etc., outside of the track. As is at once seen, this operation is facilitated by removing the heavy and bulky side sills of the only cars of which the inventor had any knowledge. Then he adds:

"All these and other features as well as the details of my construction are fully set forth below."

It now appearing that the patentee was mistaken in supposing that he was the first to dispense with side sills, and that his device for doing this and otherwise supporting the side of the car was probably anticipated, he now relies upon one of the "other features," namely, his apparatus for operating his dumping doors. The appeal is from a decree dismissing the bill upon a finding that there was no infringement.

Inasmuch as all the claims which are involved in the present controversy relate to the trapdoors and the means for operating them, we will pass by, with a brief description, that part of the scheme for taking out the side sills and supplying their function of strengthening the car and carrying the load by other means. He does this by putting four sills lengthwise along the middle of the car, a little distance apart, and building a floor thereon through the whole length of the car. To the outside of this floor, and apparently upon the outer edge of his outer sills, he hinges his doors. To atone for the lack of side sills, he strengthens the sides of the car by using heavier planking, using diagonal iron braces and suspending stout iron straps from the top of the side of the car to the bottom of the car and there turning them inward to help in supporting the load. He also uses for the same purpose "headers" extending from the bottom of the car frame upward and outward to the sides of the car. In each of these headers he makes a long slot to accommodate the devices for operating his dumping doors, a feature to be explained when we come to consider the "other features" with which we are now more particularly concerned.

There are 63 claims in the patent, 10 of which are said to be infringed. All of these 10 relate to his means for operating the dumping doors. The principal member of his apparatus consists of a long straight movable shaft of iron (or steel) extending from end to end on each side of the car. A crank-handle is located at the end of the car, and this is connected by intervening gear with the end of the long shaft, whereby the shaft is made to revolve. The shaft is carried through the long slots in the headers above mentioned. On the shaft and inside each header a cogged pinion is fastened, and on the bottom of each slot a plate is secured having cogs to mesh with the cogged pinion on the shaft. Thus, when the shaft is revolved, the cogged gear above described carries the shaft through the slots in the headers upward and outward or downward and inward. There are flanges on the sides of the cogged pinions which prevent the shaft from longitudinal movement. Partly to prevent the load bearing injuriously upon this gear for effecting movement of the shaft, loose rollers are set upon the shaft extending above the headers and supporting the doors. A horizontal rest is provided at the side of the car, so that

when the shaft is revolved out to the side, the door rests upon the rollers without any impulse to swing downward. As before stated, the inner end of the door is hinged to the side of the stationary floor, or to the timber under the floor, and the door extends out to the side of the car.

With this explanation it is perceived that the operation is this: Assuming that the car is loaded and the dumping doors are closed up and resting on the rollers at the outer end, the crank-handle at the end of the car is turned in the proper direction, the long shaft and the fixed cogged pinions revolve on the cogged plates under them, and together with the loose rolling pinions on the shaft, which support the doors, all descend down through the long slots in the headers.

The outer end of the door follows this downward and inward movement of the shaft and rollers until the load on the door slides, or rolls, off outside of the track. It should be added that, to prevent the door from swinging down too far, a stop is fixed behind it. To close up the doors. the crank-handle is turned the other way, the long shaft rolls upward and outward through the slots in the headers, and, carrying along the loose pinions. lifts up the ends of the doors to their original position. It must be confessed that there is a good deal of ingenuity in this organization, and, if it is practically useful, we should think it to be, without doubt, a patentable invention. We attach this proviso because there is some evidence in the record which raises a doubt whether from the complexity of the apparatus and the rough usage it must encounter it would not be so far liable to derangement and breakage as to destroy its utility; but we resolve that doubt, as we think we should, in favor of the patent, and we are quite prepared to believe with counsel for appellant when they say that prior to the invention of Mr. Caswell there was not a single freight car in use in the United States, or elsewhere, equipped with door-opening mechanism of this kind. We find nothing in the record which leads us to doubt it.

The claims involved are these:

"31. The car having a longitudinal series of dump doors along its sides, headers or cross-frame members between adjacent doors, and a shaft extending through and sustained by said headers and supporting the doors, substantially as specified.

"32. The car having a longitudinal series of dump doors along its sides, headers or cross-frame members between adjacent doors, and a shaft extending through and sustained by said headers and supporting the doors; said shaft being also supported at its outer end from the end sill, substantially as specified."

"44. In a car of the class described, the combination of a supporting-frame portion. a drop-bottom portion therefor formed of a plurality of swinging sections pivotally secured together at each side of a longitudinal center of the car. a reciprocating bar extending longitudinally of the car, and movable transversely thereof in engagement with each swinging section, and means for reciprocating said bar to open and close the swinging sections, substantially as described."

"48. In a car of the class described, the combination of a supporting bottom frame, a drop-floor section hinged to a longitudinal member of the frame, means supporting said section and contacting with its under surface and movable toward and from said longitudinal frame member in opening and closing said section, said means being sustained in the cross-framing of the bottom, and means for operating said supporting means."

"58. In a car, the combination of a car frame having longitudinal sill mechanism, end sills and transverse beams between such end sills, a dumping door secured to the car frame movable to open and closed positions, and dumping door supporting mechanism supported by such transverse beams; said supporting mechanism being movable longitudinally of the door.

"59. In a car, the combination of a car frame having longitudinal sill mechanism and transverse beams mounted between the ends of the car frame, dumping doors secured to such car frame movable to open and closed positions, and door-operating mechanism mounted in such transverse beams and connected with the dumping doors; said supporting mechanism being movable longitudinally of the door.

"60. In a car, the combination of a car frame having transverse beams, dumping doors secured to such car frame movable to open and closed positions, and door-supporting and operating-shaft mechanism beneath the dumping doors and supported by the transverse beams; said supporting mechanism being movable longitudinally of the door.

"61. In a car, the combination of a car frame having transverse beams mounted between the ends of the car, dumping doors secured to the car frame movable to open and closed positions, shaft mechanism mounted in such transverse beams beneath the dumping doors and operatively connected therewith for opening and closing the doors and supporting them in closed position, and means for operating such shaft mechanism; said shaft mechanism being movable longitudinally of the door.

"62. In a car, the combination of a car frame having longitudinal sill mechanism, end sills and transverse beams secured to such longitudinal sills and extending transversely of the car, dumping doors mounted in the car frame on opposite sides of its longitudinal center movable to open and closed positions and having their inner edges hinged to the car frame, forming flat-bottom portions for the car when in closed position, and door operating and supporting shafts mounted in the transverse beams beneath the dumping doors and operatively connected therewith; said shafts being movable longitudinally of the door.

"63. In a car, the combination of a car frame having transverse beams between the ends thereof, dumping doors secured to such car frame movable to open and closed positions, and shafts extending longitudinally of the car supported by such transverse members of the car frame and in operative engagement with the swinging sides of the dumping doors outside their longitudinal centers for supporting them."

The next question is: What is the character of this patent? What does it stand for? Before answering this question, we must find out how far the art of constructing apparatus for operating dumping boards in vehicles and other things kindred to railroad cars, or so near to them as to suggest to the mind of an experienced mechanic the adoption of such devices in railway cars, had been advanced. It is well and clearly shown by the opinion of Judge Sater, in the court below, that there was nothing new in the result effected by the operation of the patentee's devices for dumping doors, and by this we mean the general result of dumping the contents of a car, and not the particular mechanical result or results effected by the co-operation of some of the parts of the combination. There can be no question, and, as counsel put their case to us, it is not disputed, that the prior art showed cars with dumping doors forming part of their structure adapted to dump their loads downward through the floor and between tracks, and others adapted to open out and deflect the contents to one or both sides of the track, and some constructions showed longitudinal series of doors, operated simultaneously by means of a single crank or lever.

The only point made is that none of the previous constructions of means for effecting the dumping was the same as, or similar to, Caswell's. It is significant that counsel for the appellant should claim that this invention was a pioneer, and therefore included all means having functions adapted to effect the like result. A comparison with the means employed by the defendants for operating the dumping doors shows that this contention of the appellant in respect to the rank and scope of its patented invention is necessary to its case. If Caswell had been the first to devise a way, and the means of making it effective, for opening and closing the dumping doors on cars or other kindred things containing articles in bulk, it might be that his invention would be entitled to the rank and scope which he claims for it; but we have said enough to show that in his case such was not the fact. Counsel repeat with much emphasis that he was the first to invent the means described in his patent, and this is admitted; but this priority is only such as must be shown in every case to constitute a patentable invention. In this sense and to this extent every patentable invention is a pioneer; but it is obvious this is not the meaning of that title as used in judicial decisions defining the law upon this subject.

The case of Morley Machine Co. v. Lancaster, 129 U. S. 263, 9 Sup. Ct. 299, 32 L. Ed. 715, is the one to which constant reference is made for the definition of a "pioneer invention," and it is in itself probably the best illustration we have of facts which exhibit a pioneer or primary invention. It showed the invention of a machine containing the means for automatically—that is, by the simple application of power—separating, one by one, buttons having shanks and eyes, from a mass, turning the buttons so that they should present their eyes to the necessary uniform position, carrying them to the fabric, and there, at uniform prescribed distances apart, sewing them upon the fabric. It was an invention of the highest order. The instrumentalities employed and their mode of operation seemed almost to indicate intelligence in the machine; but what is most to the point is that Mr. Justice Blatchford was at pains to show that Morley was the first to devise means to accomplish such a result. This was what constituted the invention a pioneer and distinguished it from that class of inventions which only provide a new way of accomplishing a result which had theretofore been attained by others by other instrumentalities and in a different way. In other words, the learned justice showed that the thing done, the work performed, had never been accomplished by any machine known to the earlier art. We have referred to that case for the purpose of aiding in defining what is meant by a "pioneer invention," or to that class of inventions in which the novelty consists in the provision of means for the production of an entirely new result, one never before attained; but it is worth while to proceed with the case cited to show what effect was given to the determination of the court in regard to the character of the invention. To all such inventions, the court said, it was the policy of the law to award a corresponding compensation. The public were acquiring something altogether new, and not merely a substitute for what it already had; although the substitute might be better than the original, and to that extent might be entitled to reward.

In carrying out this policy the courts have given a liberal scope to the invention, one corresponding with its novelty, and have held that it covered not merely the very means employed, but all others which perform the same office in substantially the same way as that of the patent. In this statement of the rule the stress lies in the word "substantially." It is intended to cover all mere variations of forms, which nevertheless do the same work, perform the same "office" (to use a very suggestive word), as is accomplished by the patented device. If, indeed, the same office is not performed by the instrumentalities of an alleged infringement, if, to repeat, they do not do the same work, there is no infringement; but it is certain that the rule just stated does not apply to the case of a patent for an improvement upon an existing machine, nor to one which provides a new way to accomplish a result already attained in another way. The rule as to these latter cases is that such patents do not cover other devices which, although they perform the same work and accomplish the same result, yet do it by a different mode of operation.

Walker, in his works on Patents, states the law correctly when he says, in section 352:

"But the test of function is only the first of several tests of equivalency. The fact that one thing performs the same function as another, though necessary, is not sufficient to make it an equivalent thereof."

And further, in section 353, he adds:

"Function must be performed in substantially the same way by an alleged equivalent as by the thing of which it is alleged to be an equivalent, in order to constitute it such."

And he cites authorities of the highest character, which fully sustain these statements. This last requirement is the one which, in the case of a primary patent, is not insisted upon; but in the case before us the rule just stated, without the qualification, applies.

With these observations we turn to the examination of those parts of the defendant's apparatus for operating the dumping doors which are involved in the charge that these 10 claims of the complainant are infringed. The defendant's devices are those set forth in patents granted to one Becker later than that of the complainant's, and they have the benefit of the presumption arising from their grant that they do not infringe. Passing from this to their actual construction, we find that they dispense with heavy side sills for the car. This they were authorized to do by earlier forms of construction. They build one strong central sill lengthwise through the middle of the car. Above this they raise a narrow member, to which, on each side, the doors are hinged. The doors fill the whole bottom of the car, and there is therefore no floor between them, as in Caswell's patent. Thus they dump the whole contents of the car. The outer ends of the doors abut upon small side sills, which can be made small because they are made of metal. Narrow I-crossbeams, supported at the center of the main sill, extend across the car from side to side. There is no movable long shaft which travels in the headers and carries the pinions rolling up and down under the doors, and, as there is no such shaft

to be moved, there is no cogged pinion meshing with a cogged base to move the long shaft out and in, as in Caswell's patent. Instead of all this mechanism of the Caswell patent, a long stationary crank-shaft is suspended in brackets hanging down from the cross-sills. This long shaft, if we call it such, is made up of a series of double cranks, thus:

Supposing the shaft above mentioned to be journaled in the brackets at *a a*, rolling pinions on which the doors rest are journaled on the other loops of the shaft at *b b b*. The operation effected by this combination is this: By means of a crank-handle at *c*, the crank-shaft *d d* is turned over until the pinions on *b b b* contact with the doors. By continuing this movement the doors are raised to place, and this is made to happen when the section *b b b*, and, of course, the pinions on them, are directly over the sections of the shaft *a a*. Thus the load on the doors rests in counterpoise on the sections *b b b*. Then the doors are closed and the position is secured. All that is necessary to dump the load is to turn back the shaft off the counterpoise, or dead center, as a mechanic would call it, when the doors and their load drop by gravity and the load is discharged. There are no means for dropping the doors gradually, or of arresting the fall at any stage of their progress, as in Caswell's arrangement. The sections *b b b* fall over and down about half a circle, and then, after brief oscillation, hang suspended under the sections *a a*. This form of shaft, having loops to contact with the doors to open and close them, was not new with Becker, but was taken from the old art, older than the date of Caswell's invention.

It is, we should think, idle to say that this is the same as, or anything at all similar to, the operation of Caswell's device, and since the movable long shaft of that patent is an element in each of the claims involved, and neither it nor its mode of operation is found in the alleged infringing structure, we need not go into a comparison of other elements in the combinations of these claims, as the learned judge in the court below thought fit to do in his very satisfactory opinion. The gist of the whole of this part of the invention disappears when the movable main shaft is taken out; but it may in truth be said that there is scarcely any resemblance between the particular means employed in Caswell's patent for operating the dumping door and those employed by the defendant for the same purpose.

The judgment of the court below will be affirmed, with costs.

NOTE.—The following is the opinion of Sater, District Judge, in the court below:

SATER, District Judge. The complainant, as owner of reissued letters patent No. 12,447, issued to it as assignee of William A. Caswell, February 6, 1906, in lieu of surrendered and canceled letters patent No. 806,394, applied for December 20, 1902, and granted December 5, 1905, charges the defendants with infringement of the thirty-first, thirty-second, forty-fourth, forty-eighth,

fifty-eighth, fifty-ninth, sixtieth, sixty-first, sixty-second, and sixty-third claims set forth in such reissued letters. The bill also alleges that the defendants Ralston and Becker, while acting as official, confidential, and trusted employés of the Caswell Car Company, the complainant's predecessor, owner of the invention and application for letters patent forming the basis of such reissue, conspired and confederated to appropriate the Caswell invention and improvement for the purpose of forming the defendant company, in whose service they are now as officials and employés engaged in designing, manufacturing, and selling combined freight and dump cars, in violation of the complainant's rights. The connection of Ralston and Becker with the defendant company as officials and employés is admitted; but the defendants each deny the other charges made against them, and assert that the complainant's letters patent are wanting in invention and novelty, and that the cars made and sold by them are the sole inventions of the defendant Becker, and are covered by letters patent Nos. 762,118, 736,471, 763,947, and 768,722, all of which are owned by the defendant company. They further allege that the complainant is estopped to deny their right to use, manufacture, and sell cars made in accordance with the Becker patents.

Various types of dump cars were well known, and several kinds of cars with swinging doors, capable of being opened and closed by mechanical means, had been invented prior to the filing of any application for letters patent by either Caswell or Becker. In his reissued letters patent Caswell recognizes this fact in the statement: "This invention relates to that class of freight cars having a level floor adapted to the carrying of any class of freight and provided with trap doors adapted to be opened to dump the loads when they consist of sand, gravel, coal, or grain; the car being also adapted to be unloaded by shovel. A type of such cars is shown in my patent, No. 619,670." He knew that others had preceded him in the field of dump car invention, that the prior art had so far progressed as to admit of a classification of such cars, and that what he claims as his invention was typical or representative of a given class. That Becker is also chargeable with similar knowledge is manifest from apt statements embodied in his several applications for letters patent.

If we seek the uppermost thought in Caswell's mind, we find it as an initial statement in the third paragraph of his specifications, as follows: "The main feature of the present invention is to dispense with the side sills heretofore used in all cars of which I have any knowledge. The omitting of the side sills enables me to obtain an opening along the sides of the car floor and outside the track sufficiently large to permit the discharge of large lumps of coal without hindrance, so that all the coal can be dumped outside of the track into a chute or onto a sizing grate, and where, even if it is not immediately removed, it will not interfere with the movement of the car. This feature is of great importance, especially in coal cars. The trap doors employed are arranged in two series, one along each side of the car, and are hinged at their inner edges, and are provided with novel means for supporting and operating them, and when opened they deflect the coal beyond the track, so that the latter remains unobstructed. All these and other features, as well as the details of my construction, are fully set forth below and also illustrated in the accompanying drawings." Again he says: "The intermediate sills are at some distance from the side of the car, and, as the ordinary side sill is dispensed with, it will be seen that opportunity is thereby gained between the intermediate sills and the sides of the car for the wide doorways needed for large coal." Caswell was not, however, the first to dispense with the side sills in devices designed for transporting loads, as appears from the patents of Clark, No. 69,075, September 24, 1867, Koplin, No. 470,299, March 8, 1892, Lyon, No. 101,030, March 22, 1870 and Bellows, No. 644,890, issued March 6, 1900; nor was he the first to conceive such a device with swinging doors hinged at their inner ends and dumping its load outwardly beyond its wheels, as will appear from an examination of the patents last named.

Caswell, to regain the strength and in part the supporting power lost by dispensing with side sills, provided for such a construction of his car sides as to give them increased strength and enable them to bear a material part of the load. His method of so doing he details as follows: "The walls of the superstructure or box of the car are greatly strengthened over previous con-

structions so, that they are adapted to assist materially in supporting the weight of the load. The walls consist of heavy plank, 44 (though sheet steel may be used in place of the plank), and they are braced by diagonal braces, 42, and bolted to the wall plank by bolts, 43. These braces are not merely tying devices, but, on the contrary, are made large enough so that, in addition to that function, they also serve efficiently in stiffening the walls and enabling them to resist the tendency to sag under the load. They project into the car, and consequently the load will lodge upon and be supported by them to a very considerable extent, and to the extent that the load does thus lodge upon them the doors are relieved. They are stayed at their upper ends by the bent-over web, 45, of the angle irons, 46, forming the stakes of the superstructure (see Fig. 26), and at the bottom they rest upon or are attached to the cross members of the car frame, which are more particularly described below. Each brace extends from a stake to the adjacent cross member, much as in bridge and other truss work. I aim by this feature to increase rather than diminish the tendency of the load to arch or dome, because the weight upon the doors is thereby reduced and they are consequently more easily opened." The construction whereby a part of the load is carried by the sides of the car was anticipated by the Bellows patent, No. 644,890, the specifications of which recite that, in a car constructed in accordance therewith, "the sides of the car constitute plate girders which carry their proportion of the material or load in the car, replacing the ordinary side sills for this purpose. This plate girder construction of the sides does away with these heavy side sills below the floor level of the car, and thus not only reduces the weight of the car, but allows easy access to the part supported below its bottom. This is an important feature of my invention, and I intend to cover the same broadly irrespective of the particular construction of the car."

As the Caswell doors constitute a considerable portion of the floor area, to support them when closed, as a further substitute in part for the strength lost by reducing the number of sills, he utilizes the adjacent members of the cross frame instead of longitudinal sills; i. e., side sills, for they are the only sills with whose use he dispensed. On this point he says: "The doors form a large part of the floor area, and its outer side portions and cross frame members are placed between each pair of them, so that they may be supported in their closed positions from the adjacent members of the cross frame, instead of the longitudinal sills, as is the customary construction." The last four quotations from his specifications indicate that the bodily movable shaft, 106, is a part of the "novel means for supporting and opening" the doors. He was manifestly ignorant of the fact that others had dispensed with side sills. His primary purpose was to accomplish that result (for he says, "This feature is of great importance"), and not to provide a movable acting sill in lieu of side sills. With him, as with all previous inventors who discarded side doors, provision for operating and supporting them with whatever load they might bear, became necessary. The means provided by him operates and supports them with whatever load they have, in whatever position they may be found within the limits of their movement.

At the time Caswell and Becker applied for their respective patents here involved, they had been preceded by inventors who had devised wagons or cars having the inner ends of their dump doors hinged at each side of the longitudinal center to sills parallel with the central sill, or to a central sill, or at a point at the longitudinal center, or having a longitudinal series of dump doors along their sides with headers or cross-beams between them. Koplin's patent No. 470,299, March 8, 1892, discloses a longitudinal series of simultaneously opening doors. The dump doors in some instances dropped their load beneath the car or wagon, in others to the side. In some instances the devices dump their entire load, or practically so, as seen in the patents of Clark, Koplin, the Ingoldsby patents, Wittig, No. 590,637, Marnell, No. 342,526, Campbell and Rankin, No. 484,491, and Lewis, No. 495,096. In other instances the dump doors drop but a portion of the load, as seen in the patents of Cox, No. 476,366, Wormelsdorff, No. 189,111, Campbell and Carlton, No. 598,136, Williamson and Pries, No. 610,218, Bellows, No. 644,890, and Caswell, Nos. 645,587, 657,012, and 619,670. The prior art discloses a variety of mechanisms for the opening or the opening and closing of dump doors. Counsel have not agreed

172 F.—26

fully in their classification of such mechanisms nor is it necessary that a full and correct classification be made. Types of door mechanism employing the rock shaft are Bellows, No. 644,890, and Koplin; a hook or latch, Clark, and the British patent of Fox, No. 11,017; a chain and windlass, Souder, No. 676,-101, Campbell and Carlton, No. 598,136, Lyons, No. 101,030; a crank shaft, Campbell and Rankin, Wittig, Koplin, the British patent of Kirkconel and Noble, No. 8,709, Dederick, No. 109,188, Marnell, No. 342,526, Goodwin No. 403,584, and Kelly and Murphy, No. 689,197; a reciprocating bar and shaft, Muller, No. 707,342. We are concerned in this case with only the latter two types.

To what extent, if any, Caswell and Becker were respectively indebted to the prior art, must appear from an examination of their devices. The complainant affirms that Caswell's is a pioneer patent. This the defendants deny, and assert that the claims alleged to be infringed are restricted to the particular arrangement and construction of car supporting frame, dump doors, and dump-door actuating mechanism disclosed by his letters patent, and that the Becker invention and the Ralston car are not only substantially different from Caswell's, but possessed of conspicuously distinguishing features. The applications for their respective patents were pending at the same time. Section 4904, Rev. St. (U. S. Comp. St. 1901, p. 3389), imposed on the Commissioner of Patents the duty of declaring Becker's application an interference with that of Caswell, if in his opinion it was such, and, after a hearing by the examiner as to the question of priority of invention, to issue a patent to the party adjudged to be the prior inventor; the defeated party having, however, the privilege of appealing from the decision of such examiner. As interference proceedings regarding the applications were not declared or suggested, and as officials are presumed to perform their duties, it necessarily follows that in the judgment of the Patent Office officials there were features that distinguished one invention from the other, and that there was therefore no occasion for interference proceedings. Mr. Justice Shiras, in Boyd v. Jaynesville Hay Tool Company, 158 U. S. 260, 15 Sup. Ct. 837, 39 L. Ed. 973, in speaking of a like situation, said: "As both applications were pending in the Patent Office at the same time, and as the respective letters were granted, it is obvious that it must have been the judgment of the officials that there was no occasion for an interference, and that there were features which distinguished one invention from the other. In Pavement Company v. City of Elizabeth, 4 Fish. Pat. Cas. 189, Fed. Cas. No. 312, Mr. Justice Strong said: 'The grant of the letters patent was virtually a decision of the Patent Office that there is a substantial difference between the inventions. It raises the presumption that, according, to the claims of the latter patentees, this invention is not an infringement of the earlier patent.' It would also seem to be evident that, as the purpose of the invention was the same, and as the principal parts of the respective machines described were substantially similar, it was also the judgment of the office that the distinguishing features were to be found in some of the small and perhaps less important devices described and claimed. Burns v. Meyer, 100 U. S. 671, 25 L. Ed. 738."

The complainants invoke the doctrine of equivalents. Under the rule announced in McCormick v. Talcott, 20 How. 402, 15 L. Ed. 930, if Caswell's invention is original, he has the right to treat the defendants as infringers if they make a car "operating on the same principle, and performing the same functions by analogous means or equivalent combinations, even though the infringing machine may be an improvement of the original, and patentable as such. But if the invention claimed be itself but an improvement on a known machine, by a mere change of form or combination of parts, the patentee cannot treat another as an infringer who has improved the original machine by the use of a different form or combination performing the same functions. The inventor of the first improvement could not invoke the doctrine of equivalents to suppress all other improvements which are not mere colorable invasions of the first." Another statement of the rule is found in Chicago & N. W. R. Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053. Mr. Justice Bradley said: "Like almost all other inventions, that of double brakes came in when in the progress of mechanical improvement it was needed; and, being sought by many minds, it is not wonderful that it was developed in different and independent forms,

all original, and yet all bearing a somewhat general resemblance to each other. In such cases, if one inventor precedes all the rest, and strikes out something which includes and underlies all that they produce, he acquires a monopoly, and subjects them to tribute. But if the advance towards the things desired is gradual, and proceeds step by step, so that no one can claim the complete whole, then each is entitled only to the specific form of device which he produces, and every other inventor is entitled to his own specific form, so long as it differs from those of his competitors, and does not include theirs. These general principles are so obvious that they need no argument or illustration to support them." The complainant's and defendants' respective devices must be tested by the rule above announced.

The Caswell device belongs to the flat floor type of dump cars, which doors dump only a part of the load. A reason for this is found in Prof. King's uncontradicted statement that in 1903 "Mr. Caswell stated that a car could not be made to dump its whole load, as such a car would not be strong enough to stand up under the required service." Caswell devised a car with a central, level, immovable, longitudinal section of floor, from three to four feet wide, in immediate contact with and affixed to two central longitudinal sills and two intermediate parallel sills placed under the outer edges of the immovable floor structure. The Wormelsdorff dumping car has a quite similar sill arrangement, but not an overlying fixed level floor section. A floor section of that character, however, is disclosed in the devices of Williamson and Pries, Bellows, No. 644,890, and Caswell, Nos. 645,587 and 657,012. Consequent upon this method of floor construction, the dump doors are literally arranged along the sides and do not extend to the longitudinal center of the car, but only to the intermediate sills, and bear a correspondingly less portion of the load. He provides a series of plurality of swinging sections or doors arranged along the sides of the car, but so did Koplin. The inner ends of his doors are attached or hinged to the floor of the car or a longitudinal member of the frame, at each side of the longitudinal center of the car, and on opposite sides of such center, and no other means are provided or contemplated for hinging such inner ends. In view of his sill construction, to extend his doors to and hinge them at the actual longitudinal center would render them inoperative, because they could not then dump their loads. His placing them on opposite sides of and some distance from the center is consistent with a construction which insures a car which dumps only a part of its load, and with his belief that such construction is necessary to impart the requisite strength to a dump car.

Becker's device belongs to the flat floor type of cars whose doors dump the whole or practically the whole of the load. The same result is accomplished by the devices of Koplin, Souder, Marnell, and Wittig. To accomplish this result, and dump the load outside of the rail, it is necessary to dispense with all longitudinal floor sills between the center and outer edge of the car. The Ralston car, however, retains the outer sills; but they are placed above the floor. It has no longitudinal central floors. A central longitudinal sill or box girder, as in the Bellows patent, No. 644,890, is employed, which, that the car may dump its entire load, does not contact with, but is located below, the car floor a distance equal to the width of the cross-beams (I-beams) or headers which it supports on its upper surface. The dump doors extend inwardly to the center of the car and carry the entire load, excepting such as may rest on the cross-beams, and are secured or hinged, not as are complainant's at each side of the longitudinal center of the car, or to a longitudinal member of the car frame, or to the car frame, as variously expressed in complainant's claims, but at the longitudinal center of the car to rods located above the central sills. The Ralston car does not, therefore, infringe that element of the combination found in the forty-fourth, forty-eighth, fifty-eighth, sixtieth, sixty-first, sixty-second, and sixty-third claims, which specifies the manner and place of hinging the inner end of the dump doors of complainant's car.

The cross-beams, 75, of the Caswell device, do not span the car, but reach only to the central sill, to which they are attached. Above each beam is a centrally webbed metal frame, bolted at its ends and sides to adjacent parts of the mechanism. The headers of the Ralston car are I-beams, which rest on top of the single central sill and extend entirely across the car. The Caswell cross-beams are deeper than those of the Ralston car. This is attributa-

ble to the elongated perforations or openings in the Caswell cross-beams, whereby they are so weakened that it became necessary to strengthen them by building them up from below. As a means of supporting and operating the dump doors, the cross-frames are provided with elongated openings, 113, inclined downwardly towards the central line of the car, which openings are flanged to give added strength and to support racks, 112, secured in the openings' bottoms. Four bodily movable shafts, 106, each extending half the length of the car and carrying rollers for half of the doors on either side of the car, extended through the elongated openings. These shafts at each end and between each pair of doors are provided with rimmed gears, which gears are fast on the shaft. At the outer end of the elongated openings in the cross-frames is a short horizontal portion on which the shaft rests when the doors are closed. On the shaft beneath each door are two anti-friction door-supporting rollers, 105, which contact with metallic bearing plates in the bottom of each door. When a rotary movement is imparted to the shaft which extends through the elongated openings, the shaft moves bodily through such openings; the gears which are fast on it meshing with their corresponding rack, 112. The rotation of the shaft in one direction causes it to traverse the openings downwardly and inwardly, that the doors may open; the rotation of it in the other direction causes the shaft to move upwardly and outwardly, closing the doors. The doors of the Caswell car opened gradually. They may also, when desired, as in ballasting, be opened but partially and held in such position. The use of rack and gear for opening and closing dump doors is shown in the Ingoldsby patent, No. 613,279, November 1, 1898; the gears being attached to the bottoms of the doors and being operated by pinions supported on a shaft in brackets below.

The Caswell door-opening and door-closing shaft, like that of Muller, is of the reciprocating type. The Muller patent shows under each door a straight rigid reciprocating bar, 15, movable bodily lengthwise of the door, and carrying anti-friction rollers, 14, contacting with the inclined faces, 15, of brackets, 12, secured to the under side of each door near its side edges. The reciprocating bars support the doors when closed, as in the Caswell patent. By rocking the shaft, 22, each reciprocating bar is moved lengthwise of the door, and the door is swung open by its own weight and that of the load. The movement of the reciprocating bar, as the doors open, is aided by the inclined faces, 13. In the Caswell device, the movement of the reciprocating bar, 106, as the door opens is aided by the inclination of the elongated slots, 113, in which it travels. In the Muller patent the incline is on the door; in the Caswell, in the supporting transverse beam; but functionally the mechanisms are equivalent. When the shaft, 22, of the Muller patent, is reversed to close the doors, the reciprocating bars move bodily in the opposite direction, acting on the inclined portion of the doors, and forcing them closed, and supporting them in that position. Muller made his bar reciprocate bodily longitudinally of the car; Caswell made his reciprocate bodily to and from the central line of his car by slotting his transverse beams so that the bar may be brought near to the doors and thus using one bar for a series of doors. In the Muller device the doors are all operated simultaneously along either side of the car bottom, and he expressly specifies that: "The rollers may be mounted on horizontal slides instead of on the links as shown. The doors may extend entirely across the bottom, instead of between the center and side sills, as shown, and may be used on a gondola or other type of car, and the parts may be otherwise varied in construction and arrangement within the scope of my invention." The arrangement and construction of the devices are different; but the principle embodied in the one is found in the other. In the Bellows patent, No. 644,890, it is also specified that "the door-actuating shaft may extend longitudinally of the car," and that, without departing from his invention, other changes may be made in his car, the doors and their actuating mechanism.

In his letters patent Caswell specifically provides that the reciprocating door-opening and door-closing shaft shall operate *in* and *extend through* the elongated openings in the cross-beams. After describing the construction of his cross-frame members, especially with reference to the rimmed gears, the racks and the elongated openings, he says: "With this construction it will be seen that any rotary movement given to the shaft, 106, will cause it to move

bodily *through* the openings, 113, by reason of the engagement of the gears 109, 110, and 111, with their respective racks." Again he specifies: "For operating the shaft so that it will move bodily down or up *in* the openings, 113, any suitable mechanism may be employed," etc. Another part of his specifications recites: "By providing all of them (cross-frame members) with the webbed castings at their ends, I am enabled to form *in* them the inclined ways, through which the door-supporting shafts move, and at the same time to give those shafts support *in* each member, and thus prevent any deflection of the shafts by the load upon the door." This feature of construction enters into and is made an essential in each of the following claims, as quoted: In his thirty-first and thirty-second, "a shaft extending *through* and sustained by said headers and supporting the headers;" in the twenty-eighth, "means supporting said section and contacting with its under surface and movable towards and from said longitudinal frame member in opening and closing said section, said means being sustained *in* the cross-frame of the bottom;" in his fifty-ninth, "door-operating mechanism mounted *in* such transverse beams and connected with the dumping doors," etc.; in his sixty-first, "shaft mechanism mounted in such transverse beams beneath the dumping doors and operatively connected therewith for opening and closing the doors and supporting them in their closed position;" in his sixty-second, "door-operating and supporting shafts mounted in the transverse beams beneath the dumping doors," etc. The italicizing of the words "in" and "through" is mine. The omission of these words from the other claims in question indicates that they were not used accidentally, but discriminatingly, to express an important feature of construction and operating, and Caswell became bound by whatever limitation such words impose. Menze v. Schmidt (C. C.) 154 Fed. 845. A substantial reason existed for mounting his door-opening and door-closing reciprocating shaft in and extending it through the elongated openings. This was necessary to bring it close to the under side of the doors to support them in all their intermediate positions.

The door mechanism of the Ralston car is of the crank shaft type. The car has two series of dumping doors, each of which is operated by a single crank shaft having a series of crank arms on which are journaled friction rollers engaging the lower surface of the door. Each crank shaft is journaled in a bracket bearing attached to the under side of the cross-beam and projecting below the same sufficiently, and necessarily distant from the doors, to permit of the vertical oscillation of the crank arm. In the Bellows patent is found a rock shaft journaled in a depending bracket, extending, it is true, from the sides of the car; but his specifications permit of a different arrangement of this device. A hand lever on the outer end of the Ralston crank shaft is used for operating it. The load is dumped by a rather slight rotation of the crank shaft, as in the Bellows device, causing its crank arms to move beyond their dead center, as in the Dederick device, and away from, instead of towards, the center of the car, when they drop by weight of the load, and discharge their contents. The doors, when fully opened, are supported by the crank arms; but in the Caswell patent by a rod, 138. The doors are closed, as in the Bellows device, in which the shaft may be longitudinally arranged and thereby open all the doors on one side of the car simultaneously, by partly rotating the crank shaft, thereby causing the crank arms to swing outwardly and upwardly in the arc of a circle and lift the doors. When the doors are in their closed position they are supported by the crank shaft; the crank arms having been moved inwardly, in raising, slightly past their vertical positions or dead centers, against stops in the under side of the door. Each of the Caswell shafts rotates completely in opening and closing the door. In the Ralston car, each crank shaft rotates through a little more than 180 degrees only; its rotary motion being limited, much like that in the Wittig patent. It cannot reciprocate, because it is held in fixed bearings. The doors cannot be opened gradually or held in a partially open position, but swing, when their dropping movement commences, to their fully opened position. If complainant's patent is closely approached by the prior art, it is not infringed by an actuating device which permits the doors to fall suddenly, instead of gradually. Gould v. Spicers (C. C.) 20 Fed. 317. The transverse beams of the Ralston car are imperforate, and the shaft is not mounted in, and does not extend through, the

transverse beams of the car frame, and therefore there is lacking in the Caswell car construction that element of a combination hereinbefore set forth in the thirty-first, thirty-second, forty-eighth, fifty-ninth, sixty-first, and sixty-second claims of the Caswell patent, which provides for mounting a shaft in and extending it through the elongated openings of the cross-beams, and for this reason the car does not infringe any one of those claims. The perforations of his cross-beams is an essential element of such claims. Ball & Socket Fastener Co. v. Kraetzer, 150 U. S. 111, 14 Sup. Ct. 48, 37 L. Ed. 1019. The elongated slots are not only made an element of those claims, but the specifications show them to be necessary in the construction of Caswell's device; and he cannot assert that it is not material and that the means employed in the Ralston car of supporting the door-actuating shaft is an equivalent and covered by his claims. Wells v. Curtis, 66 Fed. 318, 13 C. C. A. 494. Moreover, the use of brackets for supporting such shafts antedated all of the patents here involved.

The crank shaft in the Ralston car has a vertical, but not a reciprocating, movement, and therefore does not infringe the forty-fourth and twenty-eighth claims of the Caswell device; one of the elements in the forty-fourth combination claimed being "a reciprocating bar extending longitudinally of the car, and movable transversely thereof in engagement with each swinging section," and in the forty-eighth claim "means supporting said section and contacting with its under surface and movable towards and from said longitudinal frame member in opening and closing said section." The crank shaft or door supporting mechanism in the Ralston car is not movable longitudinally of the dump door ,and does not, therefore, infringe the fifty-eighth, fifty-ninth, sixtieth, sixty-first, and sixty-second claims, in each of which such longitudinal movement is made a feature. The longitudinal shaft reciprocates bodily as an entirety. It is straight and rigid, and necessarily so, to perform the function assigned it in Caswell's construction. Whether or not a straight, rigid, longitudinal shaft, bodily reciprocating towards and from the center line of the car through elongated openings in the cross-frames, and supporting the dump doors when closed, and at all points between their closed and fully opened positions, and capable of holding them partially open at any intermediate point, is mentioned in the Caswell claims in controversy, the Caswell patent must be limited to a car having such a shaft when read in connection with the specifications which make such shaft a principal feature of the invention, and the drawings, in all of which the shaft is shown. Kampfe v. J. R. Torrey Razor Co. (C. C.) 149 Fed. 778. Having limited himself to such a shaft, Caswell cannot complain that the defendants use a crank shaft, an old and well-known device. Blamire v. Sheldon Axle Works (C. C.) 149 Fed. 780.

In view of the state of the art, Caswell's invention is not a pioneer. The advance towards the modern dump car has been gradual and proceeded step by step, so that no one can claim the complete whole. Caswell is therefore entitled only to the specific form of device which he produced. The defendants are entitled to their specific form so long as it differs from and does not include that of complainant. If the language of the thirty-first and thirty-second claims is not in any event readable upon the Koplin device, it becomes so if so broadly construed as to include the construction shown in the Ralston car. So too, if the language of the residue of the claims be given the broad construction contended for, I am unable to see why they may not be read upon one or more prior patented devices, such, for instance, as those of Bellows, Koplin, Wittig, and perhaps of others. The claims in controversy, to avoid invalidation, must be restricted to the particular construction and arrangements of parts to which Caswell has himself limited them by his specifications (McSherry Mfg. Co. v. Dowagiac Mfg. Co., 101 Fed. 716, 41 C. C. A. 627), and, so construed, there is no infringement. Not being a pioneer in his line of improvement, whatever may be the language of his claims, neither he nor his assignee can enjoin a device resembling his own in the adoption of ideas found in the prior art. Consolidated Valve Co. v. Crosby Steam Gauge & Valve Co.. (C. C.) 7 Fed. 768.

Considering the two door-actuating mechanisms as entireties, they proceed along wholly different lines. That of the Ralston car is less complicated, less expensive to manufacture and maintain in repair, than that of the Caswell device, more useful, and productive of a different result, in that it dumps the

whole, or practically the whole, of the load. Conceding that these features are not necessarily tests of invention, nevertheless utility may help to determine the question; increased efficiency being accepted as an important factor. It is also significant that there has been a recognized need of such a car as that of the defendants, and that the efforts of others to meet it failed, and that success was attained only after repeated experiments. American Caramel Co. v. Thomas Mills & Bros., 149 Fed. 743, 79 C. C. A. 449.

In the course of the argument, several of the earlier patents were characterized as worthless and wanting in utility. There is no evidence that such was the case. The very fact that a machine is patented is some evidence of its operativeness, as well as of its utility; and when a prior patent appears on its face to be relevant to the consideration of the prior art, the later inventor should show that such device was not useful, and, if a patentable novelty of his own invention is in dispute, that such earlier patent did not disclose the principle of his later patent. E. M. Miller Co. v. Meridan Bronze Co. (C. C.) 80 Fed. 523.

The charge of conspiracy to appropriate the invention of the Caswell patent in suit is not sustained. Becker did not by his contract with the Caswell Car & Improvement Company sell his inventive powers to his employer; nor did he, to develop and put in practicable form his invention, use the property of his employer, or the services of its employés, or any part of his time to which it was entitled. He might, therefore, performing all the duties assigned to him in the line of his employment, exercise his inventive faculties in any direction he chose, with the assurance that whatever invention he might thus conceive or perfect would be his individual property. Solomons v. United States, 137 U. S. 346, 11 Sup. Ct. 88, 34 L. Ed. 667. Nor does the record show that Ralston acted in bad faith with the Caswell Car Company or its predecessor. He rendered them substantial financial assistance. On or about May 12, 1904, he frankly announced to the stockholders of the Caswell Car Company his desire to sever his connection with it, his relation with the Ralston Company, and his purpose to exploit its patents and pending applications for patents. On November 22d of the same year he resigned the presidency of the Caswell Company, and on that date Caswell, in consideration of a final settlement then made between him and the Ralston Car Company, and the satisfactory settlement of all matters of every kind and nature in controversy or dispute between them, acknowledged full satisfaction of every claim and demand whatsoever he then had or theretofore had had against Ralston and the Ralston Car Company, and disclaimed any right, title, interest, or claim in any patents or applications for patents then pending belonging to Ralston or the Ralston Car Company. This disclaimer was subsequent to the issuance of Becker's four patents, Nos. 763,947, 763,841, 762,118, and 768,722, all of which were granted to the Ralston Car Company as Becker's assignee.

Regarding the matters in controversy of which settlement was made Ralston, whose affidavit was offered in evidence by the complainant, has this to say: "When said agreement and transfer of stock was entered into at the request and in the interest of Mr. Caswell, affiant requested Mr. Caswell, on his part, to disclaim any right, title, or interest in any patents or applications for patents, which applications for patents were then pending, and which belonged to affiant or the Ralston Car Company, in order to prevent any possible annoyance from threats of future litigation with respect to said invention or patents, and in order that affiant might assure all such as were disposed to invest in the Ralston Company that the patents and pending applications owned by the company were free of all claims and demands by said Caswell or the Caswell Car Company, and said Caswell acquiesced in this agreement." On March 4, 1905, the board of directors of the Caswell Car Company adopted a series of resolutions, reciting that the license theretofore issued by such company to the Ralston Car Company for the use of patents belonging to the Caswell Car Company be canceled, no use whatever having been made of the same by the Ralston Car Company, and that the Caswell Car Company make claim to no right or interest whatsoever in any patent owned, used, controlled by, issued to, or assigned to the Ralston Car Company by Becker or any one else. The minutes of this meeting were approved at a subsequent meeting of the board.

. On December 11, 1905, Ca'swell filed an application, serial No. 291,280, for a patent for an improvement in dumping mechanism for metallic cars. Excepting in some two or three instances, his drawings and the numerals shown on them are precisely the same as those shown in the Becker patent No. 763,841. The language of Caswell's specifications is largely identical with that found in the Becker specifications. Inadvertently an interference was declared with the Becker and other patents, and subsequently dissolved as to some of the parties. Thereupon Becker withdrew his application originally filed in the interference proceedings, and filed another for a reissue of patent No. 763,841, and the interference proceedings were resumed. Caswell, although he had made oath that he believed himself to be the original, first, and sole inventor of the improvement described and claimed in his specifications, and that he did not know and did not believe that the same was ever known or used before his invention or discovery thereof, or patented or described in any printed publication in any country before his invention or discovery thereof, filed no testimony, but suffered a judgment of priority of invention of the subject-matter in issue to be rendered in favor of Becker. In describing his invention, Caswell, using the precise language which Becker had used in his specifications, said: "My invention consists broadly in a crank shaft having a crank arm adapted to engage the doors, so that by merely revolving the shaft upon its axis in opposite directions the doors will be opened and closed." He also made oath that he completed his invention prior to February 19, 1904, the date of the Becker application, and that the original drawings attached to his affidavit were made on or before the dates of February 1, 1903, June 1, 1903, and June 28, 1903, respectively, and that a car embodying his invention was ordered from the Pullman Car Company on or about May 1, 1904, the working drawings of which were begun in the latter part of December, 1903, or the first part of January, 1904, and that the car was completed on or before July 1, 1904. He would have it believed that, at a time when he was protesting that a car could not be made of sufficient strength to dump substantially its entire load, he had drawings for just such a car, and that prior to July 1, 1904, he had completed working drawings for the construction of a car embodying his invention, which showed a crank-shaft mechanism, for which invention, notwithstanding the demand for a car of the character described, he witheld his application for a patent until December 11th following.

If the crank shaft type of door-actuating mechanism was not, on December 11, 1905, the equivalent of the door-actuating mechanism shown in the patent issued to him in 1902, and in his reissued patent, when did it become so? If the two mechanisms were equivalents, what was the occasion for his seeking a patent, the important feature of whose mechanism was a crank shaft? If he was the original, first, and sole inventor of such mechanism, why did he not at this first opportunity offer his proof to establish that fact and Becker's piracy, instead of suffering judgment for priority of invention to be entered in Becker's favor? Caswell was not produced, and did not offer himself as a witness. The answer, therefore, to these inquiries, must be found, if at all, in the facts and circumstances disclosed by the record. The reasonable conclusion to be drawn from the record, in my judgment, is that Caswell recognized that the two door-actuating mechanisms are different, and not equivalents, that he endeavored to avail himself of both; that priority of invention as between him and Becker, as regards the crank-shaft mechanism, belongs to Becker; and that the two freely given disclaimers stood as a barrier to his successful maintenance of his claim, in the interference proceeding, of original, first, and sole invention. The disclaimers and the abandonment of such proceeding do not consist with the charge of conspiracy made in the bill. Caswell and his successors in title may not be heard to say that at the time of the disclaimers and of the interference proceeding the precise nature of the Becker invention was not known.

I shall not enter into a discussion of the license granted to the Chicago, Burlington & Quincy Railroad Company, or to the Atchison, Topeka & Santa Fé Railway Company, or to Ralston, or the assignments made of the Caswell patents, because they do not, in my judgment, affect the result. Dueber

Watch-Case Mfg. Co. v. Robbins, 75 Fed. 17, 21 C. C. A. 198; Noonan v. Chester Park Athletic Club Co., 99 Fed. 90, 39 C. C. A. 426; Curtis on Patents (4th Ed.) § 215.

An order may be drawn dismissing the bill at the complainant's costs.