<hr/>

### DUNHAM v. KELLEY-KOETT MFG. CO.

(Circuit Court of Appeals, Sixth Circuit. December 4, 1917.)

No. 2999.

1. PATENTS &#x29 D8;328—VALIDITY AND INFRINGEMENT—X-RAY APPARATUS.

The Churcher patent, No. 762,881, for an X-ray apparatus, which is in fact a device for transforming an alternating into a direct pulsating current for the operation of an X-ray machine, discloses a true combination of utility, which, although the elements were old in use in other connections, required invention. Claims 1 and 2 *held* valid and infringed.

2. PATENTS &#x29DB;46—UTILITY.

Patentable utility is not negatived by the fact that a user found it desirable to use additional apparatus in connection with the patented invention.

3. PATENTS &#x29DB;25—AGGREGATIONS—ELECTRICAL APPARATUS.

Agencies associated in electrical apparatus are not easily shown to be a mere aggregation.

&#x29DB;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. PATENTS ☞20—INFRINGEMENT—EQUIVALENTS.

A compound electrolyte cell, consisting of two electrolytes separated by a partition and connected by a bridge, *held* equivalent to a simple cell.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suit in equity by Kennon Dunham against the Kelley-Koett Manufacturing Company. Decree for defendant, and complainant appeals. Reversed.

C. W. Miles, of Cincinnati, Ohio, and Wood & Wood, of Athens, Ohio, for appellant.

Harvey Myers and Allen & Allen, of Cincinnati, Ohio (Alfred M. Allen, of Cincinnati, Ohio, of counsel), for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. This is an infringement suit, brought upon patent No. 762,881, issued June 21, 1904, to Churcher, assignor to Dunham, for "X-ray apparatus." The District Court thought that, if the patent was valid, it was not infringed, and dismissed the bill. The name given by the Patent Office to the invention is not very accurate, since the device pertains, specifically, only to the production of electric current appropriate for use in producing the X-ray rather than to the X-ray apparatus itself. At the time of the invention, it was the recognized practice to use an induction coil for supplying current to the X-ray bulb, and to conduct to the primary coil a direct pulsating current of comparatively low voltage. This was delivered to the bulb from the secondary coil as a pulsating current of much higher voltage, and, in this latter form, it was efficient to produce the X-ray. If the current supplied to the primary coil were alternating, as good results could not be had, and so it was well understood that if the available source of supply delivered an alternating current, this must be transformed into the direct before it was carried to the primary coil; and Churcher's invention had to do with this transformation. If, as was then commonly true, it was necessary to employ the alternating current furnished by the electric light or power company, two things must be accomplished before it was most suitable for use in the primary coil: It must pass through some device which would cause it to flow in one direction only, and it must be interrupted so that it would be pulsating instead of continuous.

Churcher was not the first to observe these necessities or to meet them. The alternating current could be and was changed into the direct by using a motor generator. This may be called mechanical transformation. It was also known that if an alternating current were passed through an electrolytic cell, the anode of which was composed of aluminum and the cathode of a mere conductor, like lead, the positive waves of the current passed through without material obstruction while the negative waves were partly suppressed, so that there would travel away from the cathode a current which was dominantly

unidirectional. This method had been employed to some extent in the charging of storage batteries. Its use for the purpose of X-ray work had been slight and more or less experimental.

For the purpose of giving the necessary pulsating character to a continuous direct current, two methods were well known. One was a mechanical interrupter. Any suitable device which would rapidly open and close the circuit would result in a pulsating current; but the limit of possible rapidity in these interruptions was soon reached. The other known device was naturally thought of as chemical in its action, and was called the Wehnelt interrupter. It was found that if a small point of platinum were used as the cathode in the electrolytic cell, it would deliver a current of exceedingly high pulsating frequency—as high as 1,500 to the second. The theory upon which this action is supposed to rest is that the flowing of current to the cathode creates a gas which surrounds the cathode with a protective and obstructive film, thus breaking the current; but that, as soon as the current breaks, the film falls away—this operation being repeated and thus causing the pulsations.

For the specific purpose of interrupting a direct current so as to give it suitable character for use in the primary coil of the X-ray apparatus, the Wehnelt interrupter was old; for the general purpose of changing an alternating current to direct, the aluminum electrode was old; Churcher first combined in one apparatus, for the purpose of using an alternating current in operating an X-ray induction coil, the aluminum electrode or valve as the anode of an electrolytic cell, with a suitable electrolyte and with the Wehnelt interrupter as the cathode. He found that this combination was operative, and that, when properly used, it did its part in producing X-rays of at least fair efficiency. His conception of the invention was formulated in the claims of his patent, of which claims 1 and 5 are given in the margin.[1] Claim 2 is not, for present purposes, materially different from claim 1. Claims 3 and 4 relate to a modification, and are not involved, the suit being based only upon claims 1, 2 and 5.

[1] We are not able to say that there was no invention in the selection and combination which Churcher made. The utility—indeed, the necessity—of changing the alternating current to direct was clear. The motor generator was expensive, noisy and unsuitable for a physician's office and for many locations where the X-ray would be used. No one had ever made this transformation (from alternating to direct pulsating) by means wholly chemical, as that word is rather loosely

[1] 1. In combination, an X-ray generator. a secondary coil supplying current thereto, a primary coil to induce a current in said secondary, an electrolytic cell having an electrode adapted to freely pass current of one polarity and to resist the passage of current of opposite polarity, an electrode exposing a restricted surface to the electrolyte to interrupt the current, and a source of alternating current connecting said primary coil and electrolytic cell in circuit.

5. In combination with an X-ray generator, a secondary coil supplying current thereto, a primary coil to induce a current in said secondary, a source of alternating current, connecting said primary coil in circuit, and means interposed in said circuit for suppressing the waves of one polarity of said alternating current, and rapidly interrupting the waves of opposite polarity thereof.

used to cover the actions here employed and to distinguish from mechanical. The Wehnelt interrupter never had been applied to a current of the peculiar quality which resulted from passing an alternating current through an aluminum body. The nearest approach to the combination (if we give defendant the benefit of some doubts in the proofs) was that an aluminum electrode had been used to suppress—incompletely—the current of one polarity, and the resulting current had been transferred from the electrolytic cell to a mechanical interrupter and thence transferred to the primary coil of an X-ray apparatus. This had never come into use, and it seems clear enough that it did not produce satisfactory results. It is easy now to say that no invention was required to substitute the well-known Wehnelt interrupter for the well-known mechanical interrupter. If these had been both simple mechanical devices, the operation of which was clear and which would surely work as well in one environment as in another, there might be no answer to this proposition. We are not forgetting that certain chemical and electrical phenomena are as simple, clear and certain to those skilled in those arts as mechanical operations and effects would be to skilled mechanics; but, in spite of this, the record does not justify pronouncing the substitution made by Churcher to be an expedient involving only the work of an ordinarily skilled electrician. Both the ultimate effect upon the primary coil and the immediate action of the interrupter in the electrolyte must—it seems to us—have been matters of such uncertainty that the result could not be precisely foretold. A current which was not the ordinary direct current, nearly or quite unidirectional, but was one in which the waves of one polarity were incompletely suppressed, was to be subjected to an interrupting process of extreme delicacy which had never been employed upon that specific quality of current. In the electrical field, the difference between inefficiency and comparative efficiency is often the result of such seemingly trifling changes and of such obscure causes that we think the merit of invention may be attributed to the forward step which Churcher took. It is illustrative of this idea that in this record we find that the more really expert the witness is, the less positive he is regarding either theory or results of conditions which he has not tested.

[2] The patent cannot, in support of its validity, call to its aid the extensive commercial use which sometimes turns the scale; but the question is not doubtful enough to be solved according to that criterion. Not only is the defendant, if it has employed the invention, not permitted to deny patentable utility, but also it appears that some 20 of the Churcher devices were sold and put into use, and that the only one of them about which there is further testimony has continued in use with satisfactory results. This continued use has been by the plaintiff, Dr. Dunham. The fact that he has found it necessary or at least desirable to add another piece of apparatus is not important, because the addition does not pertain to the patented combination. The fact seems to be that an aluminum electrode of a standard or suitable size will not satisfactorily filter or transform an alternating current of a voltage higher than about 60, and, as the line current furnished Dr. Dunham's offices was 110, he interposed a step-down transformer

which lessened the voltage to 60 before he brought the current to the apparatus which is the subject of the patent. We think that the proper relative adjustment of incoming voltage and of aluminum electrode surface are things which it was not necessary to describe in the specification and which are not of the essence of the patented invention.

[3] We do not regard the associated agencies specified in the claim as an aggregation but rather as a true combination. Even in mechanical patents, the fact that the material is transformed or affected by successive operations does not necessarily prevent a valid combination patent upon the group of successive agencies (e. g., Oshkosh Co. v. Waite Co. [C. C. A. 7] 207 Fed. 937, 941, 125 C. C. A. 385; and see Expanded Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034); but in the electric art, the difficulty of demonstrating mere aggregation must be greatly increased. In the present case, the operations of the two electrodes and the induction coil under the current and their effects upon the current are so nearly simultaneous that the mind cannot practically conceive any interval; the filtering electrode, the electrolyte, the interrupting electrode and the induction coil are receiving, modifying and passing along the current in the circuit; the induction coil would not operate as it does, except for the presence of the interrupter, and the interrupter has its performance modified by the current peculiarities caused by the preceding electrode. We must take notice that very many electrical patents cover apparatus in which the different elements act (in theory) successively upon the current, and this whole class of patents can hardly be declared void because not for true combinations. We are satisfied that the controlling question is not whether there was an aggregation, but whether there was invention in creating the patented combination.

[4] A somewhat different aspect of the question of invention is presented by the fact that defendant does not use the same form of apparatus shown in the patent, and, of course, if defendant's form does not involve any invention as compared with the art prior to Churcher, it cannot be that Churcher's intermediate patent discloses invention of a character broad enough to cover defendant's later form. The difference between the two is this: Churcher uses his aluminum filter or valve and his platinum interrupter in a single cell containing an alkaline electrolyte. Defendant uses two cells, the first containing the aluminum electrode and an alkaline electrolyte, and the second containing the platinum electrode and an acid electrolyte. The two cells are then bridged together by two electrodes of lead, in electrical contact with each other, but which are inert and have no office excepting merely that of a conductor. This view of the matter presents most sharply the question whether there was invention broadly in substituting the Wehnelt interrupter for the mechanical interrupter in this combination; because the patentee must make this broad claim in order to include the defendant's device, and, therefore, cannot rest upon any special merit which there might be in putting both electrodes in one simple cell. We have already pointed out that the invention impresses us as having consisted in uniting these elements for the first time in electrolytic operation; and we cannot think that it rests merely in lo-

cating both electrodes in one cell. The testimony tends to show that it is better to use the two cells of defendant's form, because the platinum interrupter works better in an acid electrolyte, which would not do at all for the aluminum electrode; but it also seems that the resistance and the heat which are said to cause trouble if the platinum electrode is used in the alkaline solution can be overcome by properly increasing the electrode surface and the quantity of electrolyte. What defendant has really done is to divide one cell into two parts by a partition, using in each part the most appropriate electrolyte, and making the parts electrically one by an electric bridge. This may be an improvement, but it utilizes and embodies the underlying idea which we think the substantial invention and which consisted in using these two electrodes in this mutual relation and in this combination and with any suitable electrolyte.

There remains the question whether the form of the claims prevents giving to the patented invention the scope to which it is otherwise entitled. We think not. It is true that the first and second claims name as an element "an electrolytic cell"; but, considering that two or more cells in series are, in a general way, the equivalent of a single cell, and that there can hardly be more than one complete and functionally operative electrolytic cell in an arrangement which has only one active anode and one active cathode, we think this claim language does not exclude such a unitary though composite cell as defendant uses.

The language of claim 5 is broad enough to include the old device which had a mechanical interrupter; but, perhaps in view of the specification it should be interpreted as confined to a chemical interrupter. As we find claims 1 and 2 infringed, it is not vital to determine the validity of claim 5. We see no practical objection to leaving the decree silent on that subject, without prejudice to its consideration below. Electric Co. v. Controller Co. (C. C. A. 6) 243 Fed. 188, 195, —— C. C. A. ——.

The decree below is reversed, and the case is remanded, for the entry of the usual interlocutory decree on claims 1 and 2.[2]

---

[2] We have employed the conventional conception, assumed by defendant, that the current "flows" from valve electrode to interrupter electrode. Of course, if "flow" there is, it may be in the opposite direction.