## BARBER–COLEMAN CO. v. A. G. REDMOND CO.

### No. 7281.

Circuit Court of Appeals, Sixth Circuit.

Feb. 8, 1938.

C. Paul Parker and Lincoln B. Smith, both of Chicago, Ill. (Earl C. Carlson, of Chicago, Ill., on the brief), for appellant.

Francis J. George and Howard D. Cline, both of Flint, Mich., for appellee.

Before HICKS and SIMONS, Circuit Judges, and RAYMOND, District Judge.

SIMONS, Circuit Judge.

The patent involved in the present infringement suit is No. 1,822,679, to

Stewart and Lilja, granted September 8, 1931. It relates to an induction motor of fractional horse power of the shading ring core type for use with alternating current. Infringement not being denied, validity is the sole issue. The court below found the patent anticipated and dismissed the bill.

The claims cover a combination of elements in the electrical art, wherein control of force is as often explained by theory subject to controversy as upon principles universally accepted. The difficulty of perceiving novelty or invention in such combinations, where old elements are assembled in apparently conventional relationship, has before been noted. Banning v. Sears, Roebuck & Co., 6 Cir., 88 F.2d 45, 46; Dunham v. Kelley-Koett Mfg. Co., 6 Cir., 246 F. 845, 849.

To demonstrate the inventors' contribution to the art the appellant adopts as typical of prior motors and the most advanced development therein prior to the patent in suit, the motor described in the patent to Meyer, No. 1,750,240. This is composed of two main parts, a stator and a rotor. The stator is in the general form of a hollow rectangle of iron or steel comprising a core leg at one side, a rotor leg at the opposite side, and two end pieces joining the legs. The rotor leg comprises two pole pieces concaved at their proximate faces to form arcs of a circle. Within the circle the rotor is pivoted and free to rotate. A portion of each pole piece is encircled by a copper ring, and the core leg is wound for the passage of an electric current, which is the energizing winding for the motor. The principle or theory of operation is that the flow of electric current through the core winding sets up in the core leg what is known to the art as "flux," corresponding to the term "current" as used in electricity. This permeates the body of iron extending through the end pieces and from them into the rotor leg and thence into the rotor or armature. The copper rings are called shading rings, and their function is to delay the flow and weaken a portion of the flux. The result is that, when the shaded and unshaded flux meet at entrance to the rotor, there is set up a rotating magnetic field, which causes the rotor to revolve.

Of the claims in suit (3, 5, 7, 9, 10 and 12), claims 5 and 10 are said to be typical of the invention and are set forth in the margin.[1] The principle of operation of induction motors of the type represented by the patent is concededly old and well understood, and the principal elements, such as the stator, the rotor, the winding core, the pole pieces, and the shading rings, are likewise old in similar or identical combination. The improvement lies, as the appellant asserts, in certain aspects of dimensions, material, and organization, by which far greater power is achieved, permitting the use of the motor of the patent in operations for which prior fractional horse power motors were inadequate. Thus a new result, it is urged, had been brought about by a substantially new combination, which has achieved commercial success and which requires a holding of validity.

The departure of the patent in suit from prior art is said to consist principally in providing (1) substantially equal area of

---

[1] 5. An alternating current induction motor combining a laminated stator of the core type providing two poles having opposed concave faces, a cylindrical rotor of the squirrel-cage type disposed between said poles, short-circuited shading coils of low resistance enclosing side portions of said poles on diametrically opposite sides of said rotor so as to divide each of said faces into a section from which unshaded magnetic flux enters the rotor iron and a section threaded by a lagging flux, and means enlarging the range of distribution of said flux to the rotor iron comprising magnetic extensions of each unshaded pole section following closely the contour of the rotor, said rings of low resistance and said magnetic extensions cooperating to cause effective distribution of unshaded flux to the rotor beyond the median plane between the poles.

10. An alternating current induction motor combining a stator of the core type providing two poles having opposed concave faces, an energizing winding on the stator, a cylindrical rotor of the squirrel-cage type disposed between said poles, short-circuited shading coils enclosing side portions of said poles on diametrically opposite sides of said rotor and dividing each of said faces into a section from which unshaded magnetic flux threads the rotor iron and a section threaded by a lagging flux, each of said unshaded pole sections having an extension in the direction of the opposite pole following closely the contour of the rotor and proportioned so as to cause effective distribution of unshaded flux to the rotor beyond the median plane, said stator and winding being constructed so as to be capable of maintaining the pole faces and the faces of said extensions substantially saturated.

iron in the core leg and the rotor leg; (2) pole extensions around the rotor and following closely its contour; (3) heavy shading rings adapted to prevent excessive leakage from the unshaded to the shaded pole. Of these elements urged as necessarily distinguishing the patent from prior art, the first is not to be found in the claims, unless it is to be necessarily implied from the language of claim 10, requiring the stator and winding "being constructed so as to be capable of maintaining the pole faces and the faces of said extensions substantially saturated." But this is a description in terms of means or function, and, while equal area in the two parts of the stator is suggested in the specification, the claim is not limited to specific means, and it is doubtful from the evidence that the function of the means suggested for achieving the result claimed is supported by more than theory. The third element differentiating from prior art discloses nothing new, and it was undoubtedly within the skill of those versed in the art to adapt the size of shading rings to desired results, for the function of shading rings was well understood, and from what presently follows it must be clear that it was long understood that leakage of flux from the unshaded to the shaded pole must be taken into consideration.

The differentiating element most insistently stressed, however, is the second of the three enumerated. Recognizing that unshaded flux passes from pole to pole, and it being electrical theory at the time that this was a disadvantage reducing both torque and power, induction motors were provided with an air gap between the poles. Since air is the best known resistant to flux, and since fluxlike current seeks the line of least resistance, it was thought essential to provide between the poles a greater air space than that required between rotor and stator to enable the former to revolve. It is the elimination of this air gap as distinctive of the patent that received the greatest attention of the experts, and it is this that is most strongly urged in the briefs. Such novelty or ingenuity as is claimed for other distinguishing elements follows from the fact that the elimination of the air gap between the poles required that compensation be provided to prevent undue leakage of unshaded flux.

■ The virtue of the air gap in prior art was thought to lie in opposing by air resistance the passage of flux from pole to pole so that more of the unshaded flux, seeking its line of least resistance, would pass through the rotor. What the inventors claim to have discovered is that the extension of the pole faces about the rotor, even to the extent of entirely closing the air gap, increased torque and power, and that leakage could be compensated for by enlarging the diameter or decreasing the resistance of the shading rings, and in this respect it is urged that the inventors flew directly into the face of existing electrical theory and practice. With the respective theories of the experts as to the precise movement of flux, its control, the increase or decrease of its intensity, and the so-called "time lag" provided by changes in the dimension or location of the shading rings, we think we need have no concern, for, however sound their theory, or however accepted the scientific principle the inventors may have discovered, they are entitled to a patent only if the means by which they apply their science are novel and denote invention, and involve more than mere changes in size or dimensions. Page Steel & Wire Co. v. Smith, 6 Cir., 64 F.2d 512; A. O. Smith Corp. v. Petroleum Iron Works, 6 Cir., 73 F.2d 531, 534.

The emphasis that is laid in argument upon the integral connection between the shaded tip of one pole and the end of the unshaded pole extension loses something of its force when we note that the inventors describe as an alternative structure one in which a reluctance, such as a narrow air gap, is introduced in predetermined location between the poles. It is true that they suggest for best results a very narrow air gap, but they also concede that it may be made much wider without seriously reducing power, and that such reluctance or other equivalent restriction does not interfere with the distribution of the unshaded flux to the rotor at points beyond the center line thereof.

■ Be that as it may, the British patent to Landis and Gyr, No. 212,263, granted December 4, 1924, depicts two forms of motor, one with the narrow air gap between the poles and the other with the conventionally wide gap, but having a shunt connection between the poles at some distance from the rotor. Of this the inventors say: "At first sight it would appear that the efficiency of the motor would be reduced by reason of an increase in flux leakage." And again: "Experiments, however, have shown that this ferro-magnetic

shunt increases the periodic displacement of one partial flux which is produced by the provisions of the above-mentioned short circuiting rings, whilst the rotating field which is partly formed, becomes more compact." That this shunt organization increases both torque and power is demonstrated not only by tests made for the appellee but by tests made by appellant's experts. But in description Landis and Gyr go farther. They say that "the upper air gaps may also be omitted so that the stator is closed around the armature," and they claim such a construction in claim 4 of their patent, "small single phase motor as claimed in claim 1 characterized by the fact that the stator is closed around the short circuited armature." Undoubtedly the tests made with a Landis and Gyr motor, or one that was assumed to be such, failed to develop the torque and power of the motor of the patent, but the elements of the claims of the patent in suit are all there, and, if the present inventors flew in the face of generally recognized theory, so did Landis and Gyr before them. The present inventors may have found by trial and error the precise cross-sectional area of shading rings and the relative area of core leg to rotor leg that would give the best result, but they discovered no new principle, disclosed no new combination of elements, and, if they secured a better result, it was an improvement but in degree, and for this the law does not award a patent, however persistent and bold in research expenditure the applicants therefor may have been.

The Landis and Gyr reference is challenged on the ground that it does not disclose a practical invention, and that the suggestion therein that the air gap may be eliminated is but a pious hope or prophecy. But Landis and Gyr were manufacturers as well as inventors. They made meters, time switches, and specialties, all controlled by small induction motors. A motor taken from one of their devices called a "Maxigraph" was introduced in evidence.

The Maxigraph is an instrument for measuring consumption of electric power. Twenty-nine of them were sold in the United States, some of them as early as 1925. Invoices were introduced showing their sale in that year to Brooklyn Edison Company, to the Union Gas & Electric Company of Cincinnati, and others. They were identified as containing the motor produced by Landis and Gyr, Inc., in Switzerland by the former secretary and treasurer of the firm's New York representative. While these motors were introduced to show prior use, and while it is contended on the one hand that, though made abroad, they were subject to periodic inspection in the United States, and on the other hand that they were so concealed in the composite device as not to constitute a disclosure here, we think we need not decide that question. We agree with the District Judge in his holding that they are relevant to the extent that they demonstrate the Landis and Gyr patent to be more than a paper patent, and that its teaching was more than mere prophecy. There seems to be little doubt that the Maxigraph motors were manufactured by Landis and Gyr under their patent and sold and shipped to the United States prior to the invention in suit. We agree with the court below that the Landis and Gyr patent anticipates the claims of the patent in suit, and that the latter are invalid.

A French patent to Lescuyer and Georgel, No. 530,038, was also held below to anticipate. Having found the British patent destructive of novelty in the patent in suit, except as to such changes in size and dimension which themselves do not denote invention, we think it unnecessary to discuss the French patent. It may be noted, however, that the challenge to its disclosures is based principally upon the contention that its drawings were inadvertent and do not disclose the real significance of the inventors' thought.

The decree below is affirmed.